FILED
2012 Mar-26  AM 09:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ALBERT WILLIAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 2:09-CV-1517-SLB** |
| | ) | |
| **KAMTEK, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion for Summary Judgment. (Doc. 28.)[1]  Plaintiff Albert Williams has sued his former employer, defendant Kamtek, Inc., alleging that defendant discriminated against him on the basis of his race, his gender, and in retaliation for engaging in protected activity.   Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 28), is due to be granted.

## I.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)).

## II. <u>STATEMENT OF FACTS</u>

Plaintiff, A.J. Williams, began working for Ogihara America Corporation, in October 1997. (Doc. 31-1 at 16.) In March 2003, he became a "Safety Specialist" for Ogihara. (*Id.*

at 17.)  Magna International of America, Inc., purchased the Ogihara plant in April 2008, and renamed it Kamtek.  (*Id*. at 25; doc. 35-4 at 2.)  Defendant Kamtek offered plaintiff a position as Safety Specialist subject to a 90-day "introductory period," (doc. 35-7), which plaintiff accepted, (doc. 31-1 at 15).  The letter offering plaintiff a position with defendant stated, "At any time during the introductory period, the Company may, at its sole discretion, terminate your employment without cause without prior notice or payment in lieu thereof." (Doc. 35-7 at 2.)

Plaintiff reported to Mike Hartman, Human Resources Manager, who had also worked for Ogihara.  (Doc. 31-1 at 23; doc. 34-1 at 55; doc. 35-1 at 15, 24.)  Plaintiff testified that he did not believe Hartman had discriminated against him during the period of time he worked for defendant.  (Doc. 31-1 at 210.)  Hartman reported to defendant's General Manager, Alfred Friedl.  (Doc. 35-1 at 102.)

According to the Ogihara Position Description Form for Safety Specialist, plaintiff's "primary job function" was –

> Support department managers with training programs and service for associates.  Research safety and training products, services and information. Provide manager with information and documentation about the development, implementation, and evaluation of safety and training programs.  Coordinate injury investigations and provide assistance in preventing re-occurrence.

(Doc. 32-16 at 2.)  Plaintiff described his job duties as:

> To describe safety concerns and issues in the plant, bring them to – the way we had it set up, bring it to the manager's meeting, assign the concern to the area responsible manager, and he [would] put it on his Action Register.

3

> And the next meeting he discussed what he [did] to repair or eliminate the
> safety hazard.  I [would] follow up.

(Doc. 31-1 at 150.)  After it purchased the Birmingham plant, defendant continued the

practice of maintaining daily Action Registers.  (Doc. 40-1 ¶ 2.)

On June 19, 2008, Ted Stolpe, a Safety Specialist Manager, visited the plant to meet

with plaintiff and, according to plaintiff's notes, to perform a safety assessment of the plant.

(Doc. 31-1 at 68-69; doc. 32-21 at 9.)   Plaintiff testified that he and Stolpe –

> went over some programs that [plaintiff] had, the management visual system,
> we took a walk through the plant, just had some mutual discussions about
> some of the things I was doing that he . . . liked and wanted to take some of the
> documentations home and maybe implement it into his system.  And he
> discussed the Magna system, how its different from what we were doing and
> he would help me try to implement that system as much as he could.

(Doc. 31-1 at 70.)  He testified that the Magna system was "a little more detailed" than the

Ogihara system.  (*Id*. at 71.)  Plaintiff contends he "was never asked to meet any safety

expectation required by Magna," and he "was repeatedly told to follow the safety

expectation[s] and rules required by Ogihara."  (Doc. 40-1 ¶ 19.)

In July 2008, Lormer McGinn, a Health and Safety Coordinator from one of the

Magna facilities in Canada, came to Birmingham for several days.  (*Id*. at 75-76.)  During

this time, he created a list of concerns, which plaintiff entered into an Action Register, dated

July 11, 2008.  (*Id*. at 187-88; doc. 32-2; doc. 32-3.)  As time went by, Friedl, noticed that

items on the Action Register were not being closed.  (Doc. 35-1 at 98.)  He testified:

> [Plaintiff] was responsible to get this action register closed.  During the
> course of that time, it was apparent that [plaintiff] wasn't getting these items

4

closed and that took a few weeks to see that these items weren't getting closed. So June would have been very early on, and therefore I'm saying it's probably the end of July, August is when we really [see] that these items weren't getting addressed.

(*Id*.)

On July 15, 2008, plaintiff e-mailed McGinn and asked him for "a copy of the [Magna] safety standard with example pictures." (Doc. 32-1 at 3.) A week later McGinn responded that a copy of the Magna Safety Standards was available on the company's intranet site. (*Id*. at 2.) McGinn also asked plaintiff if he had reviewed the items he had documented and if improvements had been made. (*Id*.) Plaintiff reported that he had developed an Action Register and a focus group, and that he was addressing the corrective actions in meetings every Monday. (*Id*.)

Around this same time, Friedl received the results of an anonymous survey of defendant's employees. (Doc. 31-3 at 441-43; Friedl Depo., Pl. Ex. 8.) The following comments were listed under the category "Safe and Healthful Workplace" for various departments –

- No safety training for the past year was done. (Friedl Depo., Pl. Ex. 8 at 1.)

- Never seen a safety person in the last year until about a week ago or month. (*Id*. at 2.)

- Safety Specialist AJ Williams – provides little or no support when it comes to incident reports. Investigating and resolving safety concerns, or even simple tasks such as making sure we have supplies in our medical bags. (*Id*.)

5

- I had an injury that was reported to my safety person and still had to track the person down so I could go to the doctor.  Never investigated incident or interviewed me.  Problem still exists.  (*Id*.)

- I have signed up twice for fork lift training to receive my license, have never received any feedback on classes or when I am going to get certified.  (*Id*.)

- When I bidded into die set up[,] my crane license had expired; I asked several times to renew crane license; I was put off; never was done.  (*Id*. at 9.)

- We need more organization when it comes to safety issues.  Fire drills, tornado warnings, etc. are handled very poorly as far as getting communication across the plant.  (*Id*. at 22.)

- Some safety concerns are not fixed in a timely manner, like oil leaks.  (*Id*. at 23.)

- When there is an employee with a safety concern to his or her health, it should be [taken] seriously.  When you are continuously getting hurt by weld flash (D-ring) in the face, back, and chest someone should take the time to look at ways to fix the problem instead of putting it off.  How many times do you have to get burned in the eye with weld flash before someone takes it [into] account.  Every other line except D-ring has a guard up or something to prevent from being constantly burned every night from weld flash.  When this is the same problem for several years and nothing is being done, it goes to show how much your company really cares about you as a person.  They see you as just another employee they have to pay.  (*Id*. at 26.)

- A lot of lines have had safety issues that where not addressed for months at a time. We would never see the manager over safety.  Employees should not have to tell the Safety Manager (AJ) that there are no supplies in the first [aid] kits.  (*Id*.)

- Over shutdown I was working on a welding job . . . .  A fire started and the first extinguisher did [not] work[,] the 2nd did not either.  [The third extinguisher] finally put the fire out.  The 1st [and] 2[nd] gauges read full also.  (*Id*. at 28.)

After Friedl noticed that plaintiff was not closing items on the Action Register –
sometime in July or August – defendant's two Assistant General Managers – John Hackett
and Kevin McDonald – recommended that Friedl consider replacing plaintiff with Richard
Wallace, a white male.  (Doc. 35-1 at 96, 98; doc. 36-1 at 40-41, 42.)

Friedl decided to terminate Williams, based on "[h]is lack of getting the items closed
off from the action register and feedback from employees."   (Doc. 35-1 at 69.)  Plaintiff
conceded that a number of items on the July 11, 2008, Action Register did not show any
progress as of August.  (*See* doc. 31-1 at 201-203.)  He testified, "I had put some dates in
here as far as where we were [in August].  Maybe I didn't have time to put them in, I'm not
sure." (*Id*. at 203.)  He also testified, "I was never equipped with an outline of the specific
measures that needed immediate action as a result of McGinn's visit," or "given a timetable
regarding when any measures needed to be address[ed] or instructed that [he] needed to
correct any problems."  (Doc. 40-1 ¶ 16.)

On or about August 19-22, 2008, BSI, an independent third-party, conducted an audit
of the plant.   This type of audit occurred regularly to allow defendant to maintain
certification under certain industry standards.  (Doc. 35-1 at 382-83; doc. 36-1 at 20-22.)
BSI's final assessment cited no safety violations and listed two "Minor Nonconformities
Arising from this Assessment."  (Williams Depo, Def. Ex. 27 at 5 [filed under seal].)  The
Assessment Report stated:

Nonconformity Statement

Corrective action is not effectively planned and implemented for items logged on action registers.

Requirement
ISO 14001:2004 requires in clause 4.5.3,
". . . Actions taken shall be appropriate to the magnitude of the problems and the environmental impacts encountered."

Objective Evidence
Clean up of oil storage rooms was logged on the action register on 7/18/08. The item was assigned a completion date of 8/15/08.
1.  The outside storage room was cleaned and organized, but the door was observed open with no employees in the area.
2.  The inside storage room was observed in need of 5S implementation and housekeeping improvement.

(*Id*.)  Plaintiff testified that Brian Thorpe, Materials Manager, had volunteered to clean the oil room so plaintiff had listed him as the "owner" on the item on the Action Register.  (Doc. 31-3 at 422-23.)

The auditor presented her findings at a meeting on August 22, 2008.  (*Id*. at 421, 434.) In response to comments about the uncleaned oil shed, Thorpe presented a copy of the Action Register, from which he had removed his name and added plaintiff's name as the owner of the oil-shed item.  (*Id*. at 422.)  Thorpe denied any responsiblity for the oil-shed item.  (*Id*.) Plaintiff testified that Thorpe's removal of his name from the Action Register was a falsification of a company document.  (*Id*.) After the auditor left, Hackett expressed his disappointment about the nonconformity.  (*Id*. at 432.)  During his deposition, plaintiff testified:

> A.  When Brian [Thorpe] brought the document in, the document was altered with my name on it.

8

. . .

A.  It was whited out.  His name was whited out and replaced with my name.

Q.  And you think that was racial?

A.  Yes, sir, and the other three gentlemen involved.

. . .

Q.  Okay.  Did you discuss this with anybody?

A.  Yes, sir.  I reported it to Mike Hartman the following week.

Q.  Was the 22nd a Friday?

A.  The audit was a Friday, yes.

Q.  And you talked to Mike Hartman –

A.  Monday.

Q.  What did you tell Mike Hartman?

A.  I told him I was concerned about that incident.  I said, you know, that's – this is an amazing no-no –

. . .

A.  I said this is an amazing no-no, falsify documents with my name on it.  I don't expect you to change anything, give it back to me and let me address it.

. . .

A.  Give the document back to me and let me address it.  If I generate a document and post it in the plant, it's proper for me to go and whiteout anybody's name.  And that was the issue.  That's the issue I had with it.  Plus,

9

it was a company rule violation, falsifying documents.  And that was just
something that I never was exposed to.  That's the first time it happened.

(Doc. 31-3 at 433-35.)

Plaintiff testified that he had never made a complaint of race discrimination at
Kamtek.  (Doc. 31-1 at 109; doc. 41 at 6.)  However, he believed the changing of the Action
Register was race related.  When asked why he believed the third-party audit issue involving
Thorpe was race related, plaintiff explained it was because Thorpe is white and he is black
and Thorpe had whited out his name on the Action Register and written in plaintiff's name.
(Doc. 31-3 at 430-31, 433.)  "There were four other white males in that room, and I was
targeted on the simple issue as oil storage tank that they were all agreed and was made aware
of.  When the thing ended, everything was pointed at me."  (*Id*. at 431.)

On Tuesday, August 26, 2008, Jack Stewart, a Human Resources Manager from
Kentucky, and Hartman told plaintiff that his employment with defendant had ended, and
they gave plaintiff a letter from Friedl.  (Doc. 31-1 at 26-27; doc. 40-4.)  Defendant contends
that it discharged plaintiff because he "failed to effectively resolve, improve[,] or close[ ]
open safety violations that existed throughout the plant."  (Doc. 28 at 4.)  Friedl testified that
he decided to terminate plaintiff based on "[h]is lack of getting the items closed off from the
action register and feedback from employees."  (Doc. 35-1 at 53, 69.)

Wallace was offered employment by letter dated August 22, 2008.  (Doc. 35-9 at 2.)
He accepted the offer on August 27, 2008.  (*Id*. at 2, 5.)  Subsequently, Wallace was
terminated for "not meeting the expectations of the management team."  (Doc. 36-1 at 36.)

### III. **DISCUSSION**

Plaintiff's Complaint alleges that defendant terminated him because of his race in violation of Title VII and § 1981.  The Complaint also alleges, "The jurisdiction of this Court is invoked to secure protection for and to redress deprivation of rights secured by Title VII, § 704(a), 42 U.S.C. § 1981, and [§] 1981(a) and (b)[,] providing for injunctive and other relief against race discrimination and retaliation in employment."  (Doc. 1 ¶ 1.)  Also, he contends that "Plaintiff . . . is subjected to a continuing and on-going campaign of racial harassment and discrimination in his workplace," (*id*. ¶ 19), and that "The Defendant is liable for race discrimination perpetrated by its supervisors on plaintiff, and is liable for engaging in a pattern and practice of failing to remedy racial and sexual discrimination in the workplace," (*id*. ¶ 23).

The court notes at the outset of its discussion of plaintiff's discrimination claims that the record contains no direct evidence of discrimination.  Without direct evidence, plaintiff must prove his case using circumstantial evidence under the *McDonnell Douglas* framework and, as an initial step, establish a prima facie case of discrimination.  *See Crawford v. Carroll*, 529 F.3d 961, 975-76 (11th Cir. 2008)(quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  If plaintiff establishes a prima case of discrimination, the burden then shifts to defendant to articulate a legitimate, non-discriminatory reason for its decision.  *Id*.  If defendant is able to meet this burden, plaintiff then has the opportunity to demonstrate that defendant's proffered reason for the adverse employment action is merely a pretext for

11

discrimination. *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997)(citing *McDonnell Douglas*, 411 U.S. at 804).

## A.  TERMINATION – RACE DISCRIMINATION

### 1.  Prima Facie Case

In this circuit –

> A plaintiff establishes a circumstantial, prima facie case of racial discrimination based on disparate treatment by showing several things:  (1) [he] belongs to a racial minority; (2) [he] was subjected to adverse job action; (3) [his] employer treated similarly situated employees outside [his] classification more favorably; and (4) [he] was qualified to do the job.'"

*Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003)(quoting *Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997)(citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973))(internal quotations omitted); *see also Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 (11th Cir. 2006).

The evidence is undisputed that defendant terminated plaintiff, a qualified, African-American male, and replaced him with a white male.  This evidence is sufficient to establish a prima facie case of race discrimination with regard to his termination.  *See Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1082 (11th Cir. 2005); *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1290 (11th Cir. 1998);  *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984).

### 2.  Articulated Reason

Defendant contends that it discharged plaintiff because he "failed to effectively resolve, improve[,] or close[ ] open safety violations that existed throughout the plant." (Doc. 28 at 4.)  Friedl testified that he decided to terminate plaintiff based on "[h]is lack of getting the items closed off from the action register and feedback from employees."  (Doc. 35-1 at 53, 69.)

Plaintiff contends that "the defendant has not offered a legitimate non-discriminatory/nonretaliatory explanation for [his] termination," because it has "falsely assert[ed] that [he] admitted in his deposition that dozens of photographs taken by Lormer McGinn showed uncorrected safety violations, and that little was done to correct those violations."  (Doc. 41 at 21.)  However, defendant's articulated reason for plaintiff's termination is not that McGinn took pictures of uncorrected safety violations and it is not based on plaintiff's alleged "admission."

Defendant is required to offer proof of the basis for the decision at issue – not that it correctly decided to terminate plaintiff.  As the Eleventh Circuit has held:

> The Supreme Court made perfectly clear in *Burdine* the reason for requiring the introduction of admissible evidence of the actual reason for the action taken.  The Court stated:
>
>> Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and *to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's*

13

> *evidence should be evaluated by the extent to which it fulfills these functions.*

450 U.S. at 255-56, 101 S. Ct. at 1094 (emphasis added).

*Increase Minority Participation by Affirmative Change Today of Northwest Florida, Inc. (IMPACT) v. Firestone*, 893 F.2d 1189, 1194 (11th Cir. 1990).

Defendant's articulated reasons – that Friedl decided to terminate plaintiff based on his failure to get items off the Action Register and comments made about safety in the employee feedback – are sufficient to satisfy defendant's burden to articulate a legitimate, nondiscriminatory reason for its decision.

### 3. Pretext

Because defendant has articulated a legitimate, nondiscriminatory reason for its decision to terminate plaintiff, the burden shifts to plaintiff to rebut defendant's reasons either (1) by presenting evidence that discrimination was the real reason for the decision, or (2) by presenting evidence that defendant's reasons are "unworthy of credence." *See Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004), *cert. denied* 546 U.S. 960 (2005).

> To survive summary judgment, the employee must come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were a pretext for discrimination. This evidence must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.

*Vessels v. Atlanta Independent School System*, 408 F.3d 763, 771 (11th Cir. 2005)(internal quotations and citations omitted). "If the proffered reason is one that might motivate a

14

reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1350 (11th Cir. 2007)(quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir.2004)). "If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment." *Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007)(citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1037 (11th Cir. 2000)).

In response to defendant's Motion for Summary Judgment, plaintiff argues:

It is undisputed that Williams was told by Kamtek to continue to use Ogihara's safety standards and procedures. Prior to McGinn's visit to the Birmingham plant, Friedl continued to tell Williams and other management employees to continue to do it the Ogihara's way. The Ogihara's policies allowed for the conditions cited by McGinn. What is most important, Friedl, Magna or Kamtek never provided Williams with a copy of Magna's Safety Rules and Regulations during his employment with Kamtek.[2]

Moreover, Alfred Friedl testified that he contacted Wallace in July of 2008 about him taking Williams'[s] position. In fact, Wallace's employment agreement stated that he had to accept the job before June 6, 2008.[3] Friedl claimed that he decided to terminate Williams on August 26, 2008. (Def Ex C, Friedl Depo, p 53) Clearly, these facts raise a issue of fact as to whether reason proffered by the defendant was actual reason for its termination of Williams.

---

[2]As set forth above, McGinn did not give Williams a copy but he directed him to defendant's web site, where the standards were available. (Doc. 32-1 at 2.)

[3]As set forth above, the offer letter to Wallace is dated August 22, 2008, states that his employment is effective August 27, 2008, and is signed by Wallace on August 27, 2008. (Doc. 35-9 at 2.) The letter mentions June 6, 2008, but this appears to be a clerical error. (*See id*. at 5.)

Lomier McGinn came to visit the plant to familiarize Williams with Kamtek's way. However, he brought no written copy of Kamtek's Safety Rules and Regulations. McGinn based his finding on Kamtek's Safety Rules and Regulation, when Williams was told to follow Ogihara's Safety Rules and Regulations. Prior to and after McGinn's visit, Williams was told to continue to follow the Ogihara's Safety Rules and Regulations. However, the defendant is now claiming to have fired Williams for not complying with the Kamtek's Safety Rules and Regulations.

Furthermore, prior to his termination, there was a safety and environmental audit performed by third parties independent auditors. The third party auditors found no safety violations. The third party auditor found a minor housekeeping issue where an oil storage shed outside the plant had not been clean[ed]. The issue was corrected prior to the end of the safety and environment audit, and said correction was noted in the audit. Based on the audit, there was no safety violation in the plant when Williams was terminated.

(Doc. 41 at 22-23 [footnote added; original footnote omitted].) Plaintiff's arguments do not address "head-on" defendant's reasons for his termination – (1) he did not clear items off the Action Register and (2) he received many negative comments from his coworkers. Plaintiff steadfastly maintains that he was told to follow Ogihara's safety standards and the plant did not have safety violations. However, he concedes that items remained on the Acton Register in August that were entered in July. Also, he does not dispute that Friedl received negative comments early in July regarding plaintiff's job performance, that the comments were accurate statements, or that Friedl relied on these comments in deciding to terminate him.

Moreover, the offer letter to Wallace in August 2008, appears to be the same letter sent to plaintiff in May 2008, with only the name, address, and date on the first page changed. (*Compare* doc. 31-5 *with* doc. 35-9.) The court finds the clerical error in Wallace's offer letter and the fact that Wallace was interviewed before plaintiff was terminated are not

16

substantial evidence of "weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [defendant's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *See Vessels*, 408 F.3d at 771.  The June 2008 date in the offer letter is clearly a clerical error.  Nothing in the record indicates that anyone discussed the Health, Safety & Environmental Coordinator position with Wallace before July – including offering him the position before August 22, 2008.  Moreover, plaintiff has not presented evidence to dispute the fact that Friedl had issues with his job performance before he met Wallace.  The court finds that a reasonable factfinder would not find defendant's reasons for terminating plaintiff to be unworthy of belief merely because defendant interviewed Wallace before plaintiff was terminated and defendant used an old offer letter without changing the response date.

Because plaintiff does not rebut – head-on – defendant's reasons for his termination the court finds he has not demonstrated that defendant's articulated reason is unworthy of belief.  Therefore, defendant is entitled to judgment as a matter of law as to plaintiff's race discrimination claim based on his termination.  Defendant's Motion for Summary Judgment will be granted.

## B.  RETALIATION

Plaintiff's Complaint alleges, "The jurisdiction of this Court is invoked to secure protection for and to redress deprivation of rights ecured by Title VII, § 704(a), 42 U.S.C. § 1981, and 1981(a) and (b) providing injunctive and other relief against race discrimination

and retaliation in employment." (Doc. 1 ¶ 1.) Section 704(a) of Title VII is the anti-retaliation provision. 42 U.S.C. § 2000e-3(a). Plaintiff alleges, "In 2008, there was a safety audit by an outside entity. The outside entity found only one minor safety violation. When the plaintiff complained that the white manager responsible for correcting the minor safety violation did not correct said violation, Kamtek started to retaliate against the plaintiff." (Doc. 1 ¶ 14.) Despite alleging that defendant had a pattern or practice of "discourag[ing] the timely filing of EEOC and/or other Civil Rights charges," (*id*. ¶ 24), he does not allege that he was discouraged from filing an EEOC charge and or that he was terminated in retaliation for engaging in protected activity. Indeed, plaintiff's Complaint repeatedly alleges that he was terminated "based on his race." (*Id*. ¶¶ 21, 25(a), 31, 35(a).)

The court finds that plaintiff's Complaint does not state a claim of retaliation. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). However, both parties address the retaliation claim in their briefs. Rule 15(b)(2) provides, "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Fed. R. Civ. P. 15(b)(2). Therefore, the court will address the claim herein.

In order to establish a prima facie case of retaliation in violation of Title VII, plaintiff must establish: (1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action. *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). Title VII's anti-retaliation

provision, 42 U.S.C. § 2000e-3(a) protects two general types of activity – (1) participation and (2) opposition.[4]   However, "not every act by an employee in opposition to racial discrimination is protected.  The opposition must be directed at an unlawful employment practice of an employer . . . ."  *Butler v. Alabama Dept. of Transp.*, 536 F.3d 1209, 1213-14 (11th Cir. 2008)(quoting *Little v. United Technologies, Carrier Transicold Division*, 103 F.3d 956, 959 (11th Cir. 1997)(quoting *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir.1978))).

Plaintiff's deposition testimony indicates that he did not complain about race discrimination and he was terminated before he filed an EEOC charge.  Therefore, the court finds plaintiff did not engage in any protected activity.  "Although an employee need not use the magic words ["race"] or ["racial discrimination"] to bring [his] speech within Title VII's retaliation protections, '[he] has to at least say something to indicate [his race] is an issue. An employee can honestly believe [he] is the object of discrimination, but if [he] never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it

---

[4]Section 2000e-3(a) provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C.A. § 2000e-3(a).

is unaware of any complaints.'" *Sitar v. Indiana Dept. of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003)(quoting *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000)).  Therefore, complaints of unfair treatment alone – without mention of discrimination on the basis of a protected class – are not protected activity.  *Murphy v. City of Aventura*, 383 Fed. Appx. 915, 918 (11th Cir. 2010)("A complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the practice constitutes unlawful employment discrimination.")(quoting EEOC Compl. Man. (CCH) §§ 8-II-B(2) (2006))[unpublished]; *see also Birdyshaw v. Dillard's Inc.*, 308 Fed. Appx. 431, 436-37 (11th Cir. 2009)[unpublished]; *Hinds v. Sprint/United Management Co.*, 523 F.3d 1187, 1202-03 (10th Cir. 2008); *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006); *Hunt v. Nebraska Public Power Dist.*, 282 F.3d 1021, 1028-29 (8th Cir. 2002); *Coutu v. Martin County Board of County Commissioners*, 47 F.3d 1068, 1074 (11th Cir. 1995).

Plaintiff testified that he did not complain about racial discrimination before his termination.  (Doc. 31-1 at 109.)  Also, although he argues that the Thorpe incident was discriminatory, he did not complain that the incident was race related.  (*See* doc. 31-3 at 434-35.)  Nevertheless, plaintiff contends:

> Williams complained to the defendant about him being counseled for the Thorpe's failure to do his job.  He also raised his displeasure at the fact the white employees would failed to clean correct safety issue after they had been assigned and made responsible for correct the safety issue under the defendant's safety policies.  He believed that he was being held responsible for the white employees' failure to do their job.  Williams believes that Title VII

protects him from being punished for a white employee['s] failure to do his job. Williams complained to his supervisor on August 25, 2008 about what he considered an unlawful practice. He was terminated on August 26, 2008.

(Doc. 41 at 25.) Plaintiff's deposition testimony recounting his complaint to Hartman does not mention that he complained about race.[5] He testified that he told Hartman, "[T]his is an amazing no-no, falsify documents with my name on it" and that the issue was that Thorpe had deleted his name from the document and written in plaintiff's name. (Doc. 31-3 at 434-35.) Also, he never testified that Hartman punished him for Thorpe's failure to clean the oil shed or that he had complained that he had been punished for Thorpe's failure to clean the oil shed. Plaintiff's contention that he complained to Hartman about being punished on the basis of his race is not supported by plaintiff's deposition testimony.

The court finds that a reasonable jury could not find that plaintiff engaged in protected activity. Therefore, plaintiff's retaliation claims will be dismissed.

## C. OTHER CLAIMS

Defendant's Motion for Summary Judgment seeks an Order dismissing a pattern or practice claim, a hostile environment claim, and gender discrimination claims. Plaintiff's Complaint does not adequately allege these claims,[6] *see Twombly*, 550 U.S. at 555, and

---

[5]Plaintiff testified in his declaration, "When I complained about Thorpe's action, I told my supervisor that the company was violating my civil rights." (Doc. 40-1 ¶ 23.) The court has stricken this testimony.

[6]Plaintiff's Complaint alleges that he was "subject[ed] to a continuing and on-going campaign of racial harassment and discrimination in his workplace." (Doc. 1 ¶ 19.) His Complaint contains no factual allegations of harassment. (*See id.* ¶¶ 5-17.) He also alleges that defendant "engag[ed] in a pattern and practice of failing to remedy racial and sexual

plaintiff does not oppose summary judgment on these claims.[7]   Therefore, defendant's

Motion for Summary Judgment as to these claims will be granted.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts

in dispute and defendant is entitled to judgment as a matter of law.   An Order granting

defendant's Motion for Summary Judgment will be entered contemporaneously with this

Memorandum Opinion.

**DONE**, this 26th day of March, 2012.

*Sharon Lovelace Blackburn*
_____
SHARON LOVELACE BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE

---

discrimination," and that "defendant's standard operating procedure [is] to discourage the
timely filing of EEOC and/or other Civil Rights charges and to not take complaints of racial
and sexual discrimination in the workplace seriously." (*Id*. ¶¶ 23-24, 33-34.) His Complaint
contains no allegation that he was discouraged from complaining about discrimination or
from timely filing an EEOC charge, or that he complained about discrimination and
defendant did not act to remedy the discrimination.  (*See id*. ¶¶ 5-17.)

[7]*See Edmondson v. Board of Trustees of University of Alabama*, ("[plaintiff] did not
respond to [defendant's] motion for summary judgment on the Equal Protection Act claim.
Therefore, she has abandoned it."), 258 Fed. Appx. 250, 253 (11th Cir. 2007); *see also Smith
v. International Paper Co.*, 160 F. Supp. 2d 1335, 1347 (M.D. Ala. 2001)(plaintiff deemed
to have abandoned claim when he failed to oppose defendant's motion)(citing *Resolution
Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.), *cert. denied* 516 U.S. 817
(1995)).